Filed 3/23/26  In re Ca.V. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re CA.V. et al., | B350331 |
| Persons Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. 23CCJP00985) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. A.H., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Courtney Fisher, Deputy County Counsel, for Plaintiff and Respondent.

————————————

A.H. (Mother) appeals from the juvenile court's termination of her parental rights to her sons Ca.V. (born 2019) and Ch.V. (born 2021). The children's father, Cl.V. (Father), is not a party to this appeal. Mother claims the court abused its discretion when it denied her request to have then six-year-old Ca. testify at the Welfare and Institutions Code[1] section 366.26 hearing that resulted in the termination of her parental rights. For the reasons explained below, we disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

As this appeal involves solely the denial of Mother's request to have Ca. provide live testimony at the section 366.26 hearing,[2] we limit our summary of the factual and procedural background accordingly. Mother's appellate briefing focuses on the order concerning Ca. and makes no argument as to how the alleged error in excluding his testimony could have impacted the court's

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

[2] Mother's briefing asserts the juvenile court relied on an incorrect factor in assessing the parental-benefit exception to the termination of her parental rights, but argues this point only in the context of whether the court's exclusion of Ca.'s testimony was prejudicial and not as an independent ground for reversal.

order regarding Ch.  Accordingly, we focus on Ca. and deem any challenge as to the order concerning Ch. abandoned.  (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

## A.    Petition, Adjudication, and Disposition

On March 23, 2023, the Los Angeles County Department of Children and Family Services (DCFS) filed a section 300 petition concerning Ca. and Ch., alleging they were at risk from the parents' domestic violence and substance abuse.  At a combined adjudication and disposition hearing on May 24, 2023, the juvenile court sustained the petition, finding the parents' domestic violence and substance abuse, and failure to protect the children from both, placed Ca. and Ch. at substantial risk of harm under section 300, subdivision (b)(1).  The court removed both children from parental custody and ordered monitored visitation as well as family reunification services.  The children were later placed with paternal aunt.

## B.    Mother's Visitation

When ordering monitored visitation, the court permitted DCFS to liberalize Mother's future visitation.  After initial visits went well, DCFS did so and Mother's visits became unmonitored.  Mother thereafter rear-ended another vehicle in July 2024 with the children in her car and them not being properly seated/restrained.  Mother denied smoking marijuana that day but declined to submit to a drug test.  During a visit in November 2024, Mother failed to return the children to paternal aunt and to communicate about the children's whereabouts.  In January 2025, Ch. told his therapist that he saw Father hit Mother during a visit.  The therapist also noted Ca. was demonstrating increased anxiety and sadness about visiting his parents.

3

Given these and other incidents, DCFS filed a section 388 petition in April 2025 requesting Mother's visitation revert to being monitored. Ca.'s counsel agreed, and asked the court to order monitoring begin immediately pending the hearing on the section 388 petition, after an incident on May 2, 2025 in which law enforcement was called to paternal aunt's home when Mother refused to leave. The juvenile court granted these requests, and Mother's visits thereafter were monitored.

## C. Ca.'s Reluctance to Visit Mother

When visits initially began, Ca. was happy and excited to see Mother. That changed over time. In July 2024, Ca. told DCFS that he liked residing with paternal aunt and felt safe with her; in contrast, he said his parents were " 'mean' " and recalled seeing Mother crying and apologizing to Father. Sometime around January 2025, Ca. said that if he was asked he would say he wanted to live with paternal aunt; Mother then yelled at him. In February 2025, Ca.'s therapist reported that Ca. had increased anxiety and sadness about visits with Mother, including more nightmares and difficulty sleeping. Paternal aunt confirmed that Ca. expressed concerns about visits with Mother and was exhibiting physical symptoms of anxiety such as grinding his teeth and biting his nails.

In late April 2025, Ca. began saying he did not want to visit Mother. Mother responded to this with aggression. At one scheduled visit that Ca. wished to skip, Mother expressed to the DCFS monitor that she did not believe Ca. did not want to visit and demanded that Ca. "tell me that to my face." Ca. overheard Mother's statement and had a meltdown—he cried, shook, and asked the monitor if Ca. was in trouble. At a visit Ca. did attend, Mother launched a tirade of accusations against the DCFS

monitor during the visit, blamed others for coaching Ca. not to visit, and denied any responsibility despite her history of explosive, insulting, and aggressive actions in front of the children during visits. Mother then pressed Ca. to say he was afraid of the DCFS monitor and not Mother. Ca. began to cry and nodded he was afraid; when later speaking privately with DCFS, Ca. continued to cry and say he was afraid but would not explain why. At another visit, when the DCFS monitor attempted to end a visit after Mother's inappropriate behavior, Mother forcibly pulled Ca. away and law enforcement had to be called to secure Ca.'s release.

Ca. told paternal aunt, various DCFS social workers, and his therapist that he no longer wanted to visit Mother. A last minute information for the court, filed in June 2025, summarized the situation: "Based on direct observations and reports from caregivers and professionals, [Ca.] is currently displaying behaviors most consistent with an anxious-ambivalent attachment with [M]other, with some symptom[s] of fear, anxiety, and disorganization based on his response. [Ca.] exhibits a conflicting behavioral pattern in which he expresses a strong reluctance to visit his mother, often stating he is scared that she will become angry. When visits are mentioned, [Ca.]'s demeanor noticeably shifts, he begins crying, becomes visibly anxious, and emotionally shuts down. These consistent reactions reflect a deep internal struggle and suggest an ambivalent desire for connection paired with a fear of emotional consequences."

Mother, for her part, claimed Ca. was saying that he wanted to visit her all the time.

5

**D.    Mother Indicates She Plans to Call Ca. to Testify and the Court Orders a Bonding Study**

Once a section 366.26 hearing was set, Mother's counsel indicated Mother might call Ca. to testify at that hearing regarding the parental-benefit exception to the termination of parental rights. Mother asserted that Ca.'s testimony was necessary to explain why he stopped visiting Mother and to show the bond between them. Ca.'s counsel consistently objected that such testimony would subject Ca. to pressure from Mother and traumatize him. Ca.'s counsel also objected that the testimony was unnecessary because information was available from other sources about why Ca. was not attending visits and about the nature of Ca.'s bond with Mother. The court ordered counsel to meet and confer on the issue of Ca.'s possible testimony pending completion of a bonding study by Dr. Chuck Leeb, who the court had appointed at Mother's request to conduct such a study.

On October 1, 2025, Ca.'s therapist provided an update. The therapist stated that although Ca. had improved somewhat, he continued to exhibit symptoms of post-traumatic stress (including crying, shutting down, yelling, and physical aggression) when discussing past experiences with Mother, and that these symptoms impacted Ca.'s daily functioning. Ca.'s ability to discuss visits with Mother had improved but his tolerance was low; he would become anxious and change the subject or shut down after brief engagement. The therapist opined that Ca. having to "testify[] in court may exacerbate his current symptoms leading to increased functional impairments due to the pressure and fear he may experience having to speak on topics that are emotionally triggering for him, especially if he is being asked to speak in front of his parents."

That same day, October 1, 2025, Dr. Leeb filed his bonding study with the court. Dr. Leeb based his opinions on observing a visit between Ca. and Mother, speaking with Mother and with two social workers that monitored Mother's visits, and reviewing available DCFS reports. Dr. Leeb opined that the bond between Mother and Ca. was minimal. Their interaction was similar to one between a child and an older acquaintance, where the acquaintance provided snacks and a mobile phone for games. Dr. Leeb also opined that Mother's behavior was consistent with oppositional defiant disorder and intermittent explosive disorder, and that Mother met some criteria for narcissistic personality disorder.

DCFS updated the court about visitation between August 20 and October 1, 2025. Of the 13 available visits during that time,[3] Mother cancelled or failed to show up for four. DCFS terminated a fifth visit on October 1, 2025, when Mother arrived smelling like marijuana; security officers eventually had to intervene to remove Mother from the visitation room. Ca. was present during only two of the visits.

## E.      Section 366.26 Hearing

The court held the section 366.26 permanency planning hearing on November 5, 2025. The day before, at a pre-hearing status conference, Mother's counsel reiterated his intent to call Ca. to testify. Counsel proffered that Mother wanted to have Ca. testify about his visits with Mother and statements Ca. purportedly made to Mother "that he wants to be with her and not be adopted." Counsel for Ca. continued to object and moved

---

[3] One additional scheduled visit did not occur because the monitor was unavailable.

to exclude Ca. from testifying.  Ca.'s counsel referred to the letter from Ca.'s therapist indicating the concerns with having Ca. testify, said there was little probative value in what Mother intended to elicit from the six-year-old child, and said what Mother was proposing "is that [Ca.] is going to be forced to sit in the courtroom and have his mother confront him about why he's not wanting to have visits with her or why those visits aren't consistent, and that that is going to be incredibly damaging to [Ca.]"  In response, Mother's counsel asked the court to consider having Ca. testify in chambers.

The court indicated it would rule on whether Ca. would testify after hearing testimony from Mother, who was the only other witness Mother's counsel intended to call at the section 366.26 hearing.

1.    *Mother's Testimony*

Mother testified that during the last two or three visits, both children said how much they missed her; at the end of visits, the children cried and did not want to leave.  Mother believed Ca. had missed recent visits only because of his school schedule, and said that he had never refused visitation with her.  Mother said Ca. repeatedly expressed to her that he wanted to return to Mother's home.  Mother claimed to be familiar with the evidence in DCFS's reports, but said she was unaware of the many statements in those reports that Ca. did not want to visit with her.  She also denied any knowledge that Ca.'s therapist was concerned about Ca.'s emotional response when the topic of visitation was mentioned.

Mother disparaged Dr. Leeb's work, saying that he only observed her visit with the children for about 30 minutes and missed important interaction between her and the children.

8

Mother also denied that Dr. Leeb asked her any questions about her mental health.

### 2. *Court Ruling Regarding Ca.'s Testimony*

After Mother testified, the court granted Ca.'s request to preclude him from testifying. The court noted that Mother was proffering that Ca. would testify his recent visits with Mother "have been of a more positive nature" than his prior visits, something about which Mother had already testified. The court stated that even if Ca. confirmed this was true, the totality of the evidence showed the visits "were not of the quality or consistency that would reach the level of the parental bond." It further held that "the probative value of having [Ca.] testify to this very, very narrow issue is not sufficient to outweigh the psychological harm, which was described by the therapist."

### 3. *Court Order Terminating Mother's Parental Rights*

In determining whether to terminate Mother's parental rights, the juvenile court assessed the parental-benefit exception set forth in section 366.26, subdivision (c)(1)(B)(i). Our Supreme Court has articulated "three elements the parent must prove to establish the exception: (1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631, italics omitted.)

The court found Mother had established "some regularity" and "some consistency" "over the long term" in her visitation with the children. It concluded Mother had not shown her relationship with Ca. was a parental one that would benefit the child, but was "more one of a friendly type" "that was minimal in terms of bonding." The court found that terminating Ca.'s

9

relationship with Mother would not be detrimental and that "the benefits of permanency for [Ca. and Ch.], particularly given the length of their time in the care of the [paternal aunt], would balance against detriment" and "far outweigh any harm" from terminating Mother's parental rights.

## DISCUSSION

### A.     Applicable Law and Standard of Review

When conducting a permanency planning hearing, "the court shall consider the wishes of the child and shall act in the best interests of the child." (§ 366.26, subd. (h)(1).)  The child need not be present for the hearing unless that is what the child or the child's counsel wants, or the court orders it. (§ 366.26, subd. (h)(2).)  "[P]arents in a dependency proceeding do have a right to call and examine witnesses" including through the "issuance of process to compel attendance of witnesses." (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1085.)  But "it is within the juvenile court's discretion to exclude the testimony of a child [from a section 366.26 hearing] in order to avoid psychological harm to the child, even though that testimony is relevant, the child is competent to testify, and the child is both practically and legally 'available' to testify." (*Id.* at p. 1088.)  The court has the power to exclude such testimony where "the child's desires and wishes can be directly presented without live testimony, where the issues to be resolved would not be materially affected by the child's testimony, and where it is shown that the child would be psychologically damaged by being required to testify." (*Id.* at p. 1089.)

"We review the exclusion of a child's testimony to avoid psychological harm to the child for an abuse of discretion. (See [*In re*] *Jennifer J.*, *supra*, 8 Cal.App.4th at p. 1088.)  To the

extent [Mother] challenges the factual findings underlying the juvenile court's ruling, our review is for substantial evidence, and to the extent [her] claims raise questions of law, our review is de novo." (*In re Daniela G.* (2018) 23 Cal.App.5th 1083, 1090.)

**B.** **The Juvenile Court Did Not Abuse its Discretion in Granting Ca.'s Motion to Exclude Himself from Testifying**

The record discloses substantial evidence on all three elements of the test set forth in *In re Jennifer J.*, *supra*, 8 Cal.App.4th at page 1089, supporting the exclusion of Ca.'s testimony from the section 366.26 hearing. We therefore find no abuse of discretion in the court's decision to exclude Ca. from testifying at the section 366.26 hearing.

First, Ca.'s desires and wishes could be (and were) presented without live testimony from him. There was evidence Ca. told his caretaker (paternal aunt), DCFS social workers, and his therapist that he did not want to be with Mother. Ca. informed DCFS he preferred to remain with paternal aunt, and that he felt safe, secure, and happy in her care. Mother testified without objection that Ca. told her that he wanted to return home to Mother. The court had all the necessary information to weigh Ca.'s preferences without subjecting Ca. to testifying directly.

Second, Ca.'s potential testimony did not materially affect the issues to be resolved. Mother proffered that Ca. would testify positively about their recent visits. The court found that even if Ca. credibly testified as Mother expected about those recent visits, that testimony would be insufficient to carry Mother's burden of proof as to the parental-benefit exception in light of a wealth of other record evidence (including from the visitation monitors and Dr. Leeb's bonding study) about their overall

11

visitation and lack of a bond.  This conclusion was reasonable, particularly where the child at issue was six years old, and demonstrates the exclusion of Ca.'s testimony did not affect the result of the section 366.26 hearing.

Finally, there was evidence (which the juvenile court credited) that Ca. would be psychologically damaged by being required to testify, regardless of whether that testimony was in court or in chambers.  Ca.'s therapist opined to her concerns about the trauma to Ca. from having to testify.  There was also evidence from other sources that discussing the topic of visitation with Mother even in a safe space such as therapy was traumatic for Ca., and resulted in things such as nightmares, lack of sleep, grinding of teeth, and other symptoms.

## DISPOSITION

The orders terminating Mother's parental rights are affirmed.

NOT TO BE PUBLISHED


WEINGART, J.


We concur:




ROTHSCHILD, P. J.          M. KIM, J.


12